958 F.Supp. 1401 (1997)
DREAM TEAM COLLECTIBLES, INC., Plaintiff,
v.
NBA PROPERTIES, INC. and USA Baskerball, Inc., Defendants.
NBA PROPERTIES, INC., et al., Counter-Plaintiffs,
v.
DREAM TEAM COLLECTIBLES, INC., Counterclaim-Defendant.
No. 4:95CV945-DJS.
United States District Court, E.D. Missouri, Eastern Division.
April 7, 1997.
*1402 *1403 Frederick H. Mayer, Andrew B. Mayfield, John H. Quinn, III, Richard B. Scherrer, Bryan K. Wheelock, Carol A. Platt, Armstrong and Teasdale, St. Louis, MO, for Dream Team Collectibles, Inc.
David W. Harlan, Michael A. Kahn, Gallop and Johnson, St. Louis, MO, Salvatore Rotella, Jr., S. William Livingston, Jr., Michael J. Francese, Bingham B. Leverich, Covington and Burling, Washington, DC, for NBA Properties, Inc., Atlanta Hawks, Ltd., Celtics Ltd. Partnership, George Shinn Sports, Inc., Chicago Professional Sports Ltd. Partnership, Gund Business Enterprises, Inc., Dallas Basketball Ltd., The Denver Nuggets Ltd. Partnership, Detroit Pistons Basketball Co., CC Partners, Rocket Ball, Ltd., Pacers Basketball Corp., The Los Angeles Lakers, Inc., Miami Heat Ltd. Partnership, Milwaukee Bucks, Inc., Minnesota Timberwolves Basketball *1404 Ltd. Partnership, Meadowlands Basketball Associates, Orlando Magic, Ltd., The Philadelphia 76ers Basketball Club, Inc., Trail Blazers Inc., Sacramento Kings Ltd. Partnership, L.P., San Antonio Spurs, Ltd., Seattle Supersonics, Inc., Capital Bullets Basketball Club, Inc.
Gene J. Brockland, Jr., Lawrence E. Evans, Jr., Herzog and Crebs, St. Louis, MO, for USA Basketball, Inc.

MEMORANDUM AND ORDER
STOHR, District Judge.
Dream Team Collectibles, Inc. ("DTC") filed its second amended complaint against defendants NBA Properties, Inc., ("NBAP")[1] and USA Basketball, Inc. ("USAB").[2] DTC alleges that defendants' unauthorized use of the DREAM TEAM mark to refer to the USAB teams of NBA superstars who played in the 1992 and 1996 Olympics and the 1994 World Championship of Basketball created "reverse confusion" and constituted trademark infringement, unfair competition, false advertising and dilution in violation of §§ 32 and 43(a) of the Lanham Act, 15 U.S.C. §§ 1114 and 1125(a), Missouri statutory law and common law. DTC seeks monetary damages, injunctive relief, and various other remedies.
NBAP and the other counterclaim-plaintiffs[3] ("counter-claimants") filed their third amended counterclaims against DTC seeking monetary damages, injunctive relief (Counterclaims I-VII) and cancellation of DTC's federal registration of its DREAM TEAM trademark (Counterclaim X).[4] Counterclaimants allege that DTC's unauthorized use of the trademarks and trade dress of NBA teams constituted trademark infringement, unfair competition, false advertising and dilution in violation of §§ 32 and 43(a) & (c) of the Lanham Act, 15 U.S.C. §§ 1114 and 1125(a) & (c), Missouri statutory law and common law. Counterclaimants further allege that DTC's unlawful use of its DREAM TEAM trademark on collages containing "counterfeit" trading cards warrants cancellation of the mark.
Pending before the Court are defendants' motions for summary judgment as to DTC's second amended complaint [Docs. # 156 and 160], counterclaimants' motion for summary judgment as to Counterclaims I, II, VI, VII and X [Doc. # 157], and DTC's motion for summary judgment as to Counterclaim X [Doc. # 161].

A. Undisputed Facts

DTC'S USE OF DREAM TEAM
In 1986, DTC began utilizing the DREAM TEAM mark on framed and unframed collages of sports trading cards. By January of 1987, DTC was selling its collages in interstate commerce. DTC also applied the DREAM TEAM mark to other sports-related merchandise, including apparel, however *1405 this constituted a very small percentage of DTC's sales.
DTC displays its trading card collages on matboards which are either shrink-wrapped or framed for sale. DTC's collages usually contain licensed trading cards. Sometimes the collages contain unlicensed trading cards and licensed or unlicensed photographs of an individual athlete. Some of DTC's collages have contained trading cards depicting NBA players and/or photographs of NBA players. The logo and/or trademark of the individual trading cards are plainly visible in the collages.
DTC's promotional materials and collages contain a logo which contains the words DREAM TEAM. DTC has utilized two different DREAM TEAM logos. See Court's Exhibit 1 attached hereto. DTC's basketball collages do not contain a disclaimer advising consumers that the collages are not licensed products of the NBA, NBAP, USAB or NBA teams. Although DTC collages vary in numerous respects, a photocopy example of a DTC basketball collage is attached hereto as Court's Exhibit 2.
On May 21, 1990, DTC filed an application for federal registration of the DREAM TEAM trademark in International Class 16 (publications and printed materials). DTC sought registration of DREAM TEAM as a word mark. In its application, DTC stated that it had adopted and was using the DREAM TEAM mark for framed and unframed sports collages. On November 6, 1990, the United States Patent and Trademark Office ("PTO") refused DTC's registration based on a prior registration by Charlico, Inc. ("Charlico") for the mark AMERICAN DREAMTEAM for posters in International Class 16. The PTO stated that "[b]ecause of the similarity of the marks and the similar nature of the goods namely both applicant's and registrant's goods are art work, intend to be mounted on a wall and the fact that the goods are likely to move in the same channels of trade, the consumer may be confused as to the source of the goods." Mem. in Opp. (Complaint),[5] Exh. 3. DTC sought and ultimately obtained the cancellation of Charlico's registration. The PTO then permitted DTC's application to proceed and, subsequently on September 26, 1995, the PTO issued a certificate of registration to DTC for the DREAM TEAM trademark in International Class 16. Mem. in Opp. (Complaint), p. 5, Exh. 10. On August 8, 1995, the Missouri Secretary of State's Office issued a registration certificate to DTC for its DREAM TEAM mark. Mem. in Opp. (Complaint), Exh. 11.
In some of DTC's trading card collages, what appear to be licensed trading cards are not trading cards at all, but color photocopies of the front sides of trading cards. The back sides of the photocopies are blank.[6] DTC's president, Ed Gaines, stated that on some occasions DTC utilized photocopies of trading cards for inclusion in collages labelled as reprints. DTC made the color photocopies at a Kwik Kopy store in Creve Coeur, Missouri. Disputes of fact exist as to the number of photocopies made, the number of photocopies incorporated into collages, and the number of photocopies actually sold.[7] Gaines *1406 estimates that the majority of trading cards which were photocopied were cards that DTC had obtained from sources that had "gone out of business." DTC's Reply Mem. in Supp. (Counterclaims), p. 7. DTC copied only baseball and football trading cards except for one instance where DTC copied a Magic Johnson basketball trading card, not for use in a collage, but to "show reps and customers what it looked like." DTC's Reply Mem. in Supp. (Counterclaim), p. 8; Depo. of E. Gaines, pp. 685-87.
A significant number of the cards which DTC copied contained a trademark and/or copyright symbol. The manufacturers and/or distributors of the trading cards which DTC photocopied did not authorize anyone associated with DTC to make or sell color photocopies of the trading cards. As of November, 1996, DTC was no longer making color photocopies or using color photocopies of trading cards in its collages.
DTC is a Missouri Corporation. DTC has sold its products in retail outlets (including kiosks) in St. Louis, Missouri and in other areas of the country. DTC has also sold its products, through various distribution channels including department stores, sports retail outlets, grocery/drug chains, and gift shops. Affidavit of E. Gaines. From its inception in 1986 through 1995, DTC sales have been under $7 million. DTC's average annual gross sales from 1987 through 1995 were $661,506. DTC's average annual advertising expenditures from 1987 through 1995 were approximately $2,700.

DEFENDANTS' USE OF DREAM TEAM
Prior to the 1992 Olympics, the USAB men's basketball team that represented the United States ("U.S.") in the Olympics was made up solely of amateur (college) players. In 1990, the international governing body for basketball competitions changed its eligibility guidelines which made it possible for USAB to field a team of professional players. USAB and the NBA decided that the 1992 U.S. men's Olympic basketball team would be comprised primarily of star NBA players ("the 1992 USAB Olympic team"). Mem. in Supp. (Complaint), p. 5.
This decision was widely publicized. The February 18, 1991 Sport Illustrated cover featured a photograph of Magic Johnson, Michael Jordan, Charles Barkley, Patrick Ewing and Karl Malone wearing USAB uniforms under the heading DREAM TEAM. The magazine featured a six-page article by Jack McCallum entitled "Lords of the Rings." This article, which does not contain the phrase DREAM TEAM, examined the likelihood that these five NBA players would comprise the 1992 USAB Olympic team. It was McCallum's idea to refer to these five players as a DREAM TEAM. Affidavit of J. McCallum. The management of Sports Illustrated made the decision to put the words DREAM TEAM on the magazine's cover. Id.
In March of 1991, NBAP entered into an agreement with USAB wherein NBAP became USAB's exclusive marketing agent and representative for the licensing, marketing and commercial exploitation of USAB's marks. Mem. in Support (Complaint), pp. 4-5. On April 7, 1991, a number of NBAP executives and managers met to discuss how to implement this agreement and maximize gross revenues. Around that same time, NBAP began developing a proposal package designed to sell sponsorships for the 1992 USAB Olympic team. NBAP utilized a copy of the February 18, 1991 Sports Illustrated cover as the cover page for its initial proposal package. Mem. in Opp. (Complaint), p. 13, Exhs. 33-34.
Sometime in April of 1991, an NBAP officer instructed Terese Cohen, NBAP's outside trademark counsel, to "follow-up" on a suggestion he had received that NBAP obtain a trademark for DREAM TEAM "for licensing opportunities, etc." On April 30, 1991, Cohen obtained a cursory trademark search report for the DREAM TEAM mark. The report identified DTC's pending federal trademark application for DREAM TEAM in International Class 16, as well as other pending federal applications and registrations of *1407 marks containing the words "dream" and "team." Mem. in Opp. (Complaint), p. 11, Exh. 24. On June 14, 1991, NBAP filed its federal trademark "intent to use" application for DREAM TEAM in International Classes 16 (publications and printed materials), 25 (clothing), and 28 (toys and sporting goods). NBAP sought registration of DREAM TEAM as a word mark, as had DTC. The PTO refused NBAP's registration, citing DTC's pending application. Mem. in Opp. (Complaint), p. 12, Exh. 28.
By at least July of 1991, defendants were, through the media, referring to the 1992 USAB Olympic team as the DREAM TEAM. On July 15, 1991, NBAP, USAB and the National Broadcasting Company ("NBC") issued a joint press release regarding the NBC live television presentation scheduled for September 21, 1991. The press release referred to the one hour television special during which the NBA players for the 1992 USAB Olympic team would be named. The press release included a reference to the "Dream Team." Mem. in Opp. (Complaint), Exh. 36. Subsequently, on September 21, 1991, USAB issued a press release entitled "1992 USA BASKETBALL `DREAM TEAM' UNVEILED." This September press release stated that the USAB Basketball national men's team was "appropriately coined the `Dream Team'" and that "The `Dream Team' 10 are virtually a Who's Who in the NBA." Mem. in Opp. (Complaint), Exh. 37.
In 1991 and 1992, NBAP mentioned DREAM TEAM in its licensing agreements. During that same time, NBAP also asserted rights in the DREAM TEAM mark against third parties. For example, in 1991, USAB and NBAP entered into an agreement with Kraft General Foods ("Kraft") which stated that Kraft "may use `Dream Team' in reference to the USA Basketball team ... however, this is not a protected name." Mem. in Opp. (Complaint), p. 14, Exh. 38. Kraft used the DREAM TEAM mark on posters. In 1991, pursuant to a similar license agreement, McDonald's used the phrase DREAM TEAM on caps. On August 19, 1992, USAB's General Counsel warned a Swedish company to abandon plans to market a basketball calendar using photographs of the USAB team and bearing the DREAM TEAM mark because "[USAB] has secured the rights to all player likenesses as well as to the phrase `Dream Team', and both are protected properties." Mem. in Opp. (Complaint), pp. 14-16, Exh. 44. On September 3, 1992, USAB's General Counsel objected to the use of DREAM TEAM in an advertisement by MGM Grand Air, stating that the proposed ad "would support, at the very least, an unfair competition argument." Id. Exh. 45.
In October of 1993, NBAP developed a DREAM TEAM II logo for use by sponsors and licensees in connection with the 1994 World Championship of Basketball. In 1995, NBAP developed another DREAM TEAM logo that it licensed for use by sponsors and licensees in connection with the 1996 U.S. men's Olympic basketball team. Mem. in Supp. (Complaint), p. 10. See Court's Exhibit 1 attached hereto. The PTO cited DTC's application and subsequent registration of DREAM TEAM in its refusal of NBAP's attempted registration of DREAM TEAM II and DREAM TEAM 96. Mem. in Opp. (Complaint), p. 13, Exhs. 29-30.

B. Summary Judgment Standard
This Court must grant summary judgment if, based upon the pleadings, admissions, depositions, and affidavits, there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The moving party must initially demonstrate the absence of an issue for trial. Id. at 323, 106 S.Ct. at 2552-53. Any doubt as to the existence of a material fact must be resolved in favor of the party opposing the motion. "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). Nevertheless, once a motion is properly made and supported, the nonmoving party may not rest upon the allegations in its pleadings but must instead set forth specific facts showing that there is a *1408 genuine issue of material fact for trial. Fed. R.Civ. P. 56(e). Summary judgment must be granted to the movant if, after adequate time for discovery, the nonmoving party fails to produce any proof to establish an element essential to the party's case and upon which it bears the burden of proof at trial. Celotex Corp., 477 U.S. at 322-24, 106 S.Ct. at 2552-53. For "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323, 106 S.Ct. at 2552.

C. Reverse Confusion
In its second amended complaint, DTC pleads a theory of reverse confusion. The Court is not aware of any case in which the Eighth Circuit has recognized a theory of reverse confusion,[8] thus, its threshold analysis is whether DTC's claims of reverse confusion are cognizable in the Eighth Circuit.
The traditional pattern of classic "forward confusion" occurs when customers mistakenly think that the junior user's goods or services are from the same source as or are connected with the senior user's goods or services. Customers want to buy the senior user's product and because of the similarity of marks, mistakenly buy the junior user's product instead. In "reverse confusion," customers purchase the senior user's goods under the mistaken impression that they are getting the goods of the junior user. That is, reverse confusion occurs when the junior user's advertising and promotion so swamps the senior user's reputation in the market that customers are likely to be confused into thinking that the senior user's goods are those of the junior user: the reverse of traditional confusion.
J. Thomas McCarthy, 3 McCarthy on Trademarks and Unfair Competition § 23:10, p. 23-22 (4th ed. 1996) ("McCarthy on Trademarks"). If a consumer is under the misimpression that the junior user is the source of the senior user's goods, the consumer may consider the senior user the unauthorized infringer, thus the junior user's use of the mark may injure the senior user's reputation and impair its goodwill. Id.
All U.S. Courts of Appeals which have considered claims of reverse confusion have accepted the doctrine. See, e.g., Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co., 561 F.2d 1365, 1372 (10th Cir.1977) (not recognizing reverse confusion would result in "immunization from unfair competition liability of a company with a well established trade name and with the economic power to advertise extensively for a product name taken from a competitor"); see generally Thad G. Long & Alfred M. Marks, Reverse Confusion: Fundamentals and Limits, 84 Trademark Rep., 1, 4 (1994). This Court concludes that the Eighth Circuit Court of Appeals would recognize that the likelihood of confusion language of § 32(1) of the Lanham Act is broad enough to encompass reverse confusion.

D. Defendants' Motions for Summary Judgment as to DTC's Second Amended Complaint[9]
Defendants move for summary judgment as to DTC's second amended complaint on three grounds.[10] First, defendants argue that DTC does not have trademark rights in DREAM TEAM that preclude defendants *1409 from licensing the mark to sponsors and licensees who wish to associate their goods and services with the USAB basketball teams. Relying upon Illinois High School Ass'n v. GTE Vantage, Inc., 99 F.3d 244 (7th Cir.1996), cert. denied, ___ U.S. ___, 117 S.Ct. 1083, 137 L.Ed.2d 218, (1997) ("IHSA v. GTE"), defendants argue that the media's widespread use of the term DREAM TEAM to refer to the team of NBA superstars who played for USAB in the 1992 Olympics (and subsequently in the 1994 World Championship of Basketball and the 1996 Olympics) created superior rights in defendants to use the DREAM TEAM mark for goods and services sold in association with those teams. Next, defendants argue that there is no likelihood of confusion between defendants' use of the DREAM TEAM mark and DTC's use of the DREAM TEAM mark. Finally, defendants argue that DTC's claims are barred by its own unclean hands because DTC has sold "counterfeit" trading cards in collages which bear its DREAM TEAM mark and because DTC has failed to include a disclaimer in its collages advising consumers that the collages are not licensed products of the NBA, NBAP, USAB or NBA teams.

i. Whether the media is responsible for the public's association of DREAM TEAM with the USAB teams
Defendants argue that the media's widespread use of the term DREAM TEAM to refer to the USAB teams of NBA players created superior rights in NBAP to use the term for goods and services sold in association with those teams. In briefing this issue, both NBAP and DTC cite extensively to IHSA v. GTE wherein the Seventh Circuit faced "a novel issue of trademark law." Id. at 245.
In IHSA v. GTE, the Illinois High School Association had used the trademark MARCH MADNESS since the early 1940s to designate the Illinois high school basketball tournament held every year in March and sometimes broadcast nationally. In 1982, CBS television broadcaster Brent Musburger used the term MARCH MADNESS to designate the NCAA's Final Four college basketball championship games. "The term caught on and is now widely used by the media and the public to denote this [NCAA] basketball tournament as well as IHSA's." Id. at 245. In 1993 or 1994, over ten years after the media had created public association of the term MARCH MADNESS with the NCAA tournament, the NCAA began to license use of the term MARCH MADNESS to companies that wished to associate their goods and services with the NCAA tournament. Id. In 1996, the Illinois High School Association brought its trademark infringement suit against defendant GTE Vantage, Inc., a licensee of the NCAA. GTE was using the term MARCH MADNESS to promote a CD-ROM game called "NCAA Championship Basketball." The Illinois High School Association proceeded on a theory of reverse confusion, claiming that its customers would mistakenly believe that its trademark affixed to its own merchandise referred to the NCAA tournament, and that this confusion would impair its ability to make money by licensing its trademark on merchandise. Id. at 246.
The district court held that the Illinois High School Association did not have a trademark that the law would protect, at least "so far as the use of the term MARCH MADNESS in connection with the NCAA tournament is concerned." Id. at 246. The Seventh Circuit agreed, finding that "[a] trademark owner is not allowed to withdraw from the public domain a name that the public is using to denote someone else's good or service, leaving that someone and his customers speechless." Id. at 247. Judge Posner, writing for a unanimous panel, went on to state:
It [a trademark] is mainly just a designation of source, 15 U.S.C. §§ 1114(1), 1125(a), and dies when it ceases to designate, for whatever reason other than the culpable conduct of the defendant. * * * Were NCAA responsible for blotting out the exclusive association of "March Madness" with the Illinois high school basketball tournament, IHSA might have a remedy on a theory of reverse confusion, though probably not an injunctive remedy since that would promote confusion among consumers, most of whom now identify the term with the NCAA tournament. But *1410 IHSA blames CBS, which is not a defendant, rather than NCAA, much less Vantage [a licensee] for the blotting out.
Id. at 246-47.
The principles enunciated in IHSA v. GTE do not entitle defendants to summary judgment. In IHSA v. GTE it was undisputed that the media, not the NCAA, had created the public's association of the term MARCH MADNESS with the NCAA basketball tournament. Here, a genuine issue of material fact exists as to whether defendants, not the media, are responsible for the public's association of the DREAM TEAM mark with the USAB teams of NBA players.[11]
Defendants vigorously argue that it is undisputed that the media is responsible for the public's use of DREAM TEAM to refer to the USAB teams. To support this claim, defendants state that between the February 18, 1991 publication of the Sports Illustrated cover containing the DREAM TEAM heading and October of 1993, when NBAP claims it first licensed use of the DREAM TEAM mark, the 1992 USAB Olympic team had been referred to as the DREAM TEAM in more than 5,000 newspaper and magazine articles and the name DREAM TEAM had appeared in the headlines of more than 475 such articles. Mem. in Supp. (Complaint), p. 6; Affidavit of J. Yablon. The Court questions defendants' characterization of the proffered statistics and finds that the statistics fail to address the essential issue: whether defendants, utilizing the media, created this association.
Defendants' compilation of articles is not conclusive evidence that the media created the public's association of the term DREAM TEAM with the USAB team. On the contrary, the compilaetion may actually lend support to DTC's position that defendants created the association. Prior to defendants' press releases in late July and September of 1991 referring to the USAB team as the DREAM TEAM, very few articles utilized the term in that context.[12] On September 21, 1991, NBC aired a one-hour television special during which the NBA players for the 1992 USAB Olympic team were named. On that same day, USAB issued a press release entitled "1992 USA BASKETBALL `DREAM TEAM' UNVEILED." In the following week, twenty-seven articles used DREAM TEAM in connection with the 1992 USAB Olympic team. In the months and weeks following, media references to the USAB DREAM TEAM increased. A reasonable jury could find that the timing of these articles supports, not the media's popularization of the term DREAM TEAM, but defendants' popularization of the term in connection with the 1992 USAB basketball team.
*1411 Although the above facts are not in dispute, the inferences to be drawn from these factswhether the media or defendants caused the public to associate the term DREAM TEAM with the USAB teams remain in dispute. A reasonable jury could find that defendants' decision to use the DREAM TEAM mark in press releases, media guides, television shows and licensing and sponsorship agreements (combined with NBAP's ability to use the media as a promotional tool) created the public's association of the DREAM TEAM mark with defendants. The Court finds that a genuine issue of material fact remains as to whether defendants are responsible for creating the association of DREAM TEAM with the USAB teams comprised of NBA players and thereby essentially blotting out the association of DREAM TEAM with DTC.

ii. Whether DTC has demonstrated a likelihood of confusion
In addition to proving that it has a right in the DREAM TEAM mark that the law will protect, DTC must demonstrate that defendants' use of the mark is likely to cause confusion. Likelihood of confusion is the relevant test for actions brought under §§ 32 and 43(a) of the Lanham Act. In the Eighth Circuit, a Court must consider the following factors when analyzing likelihood of confusion:
(1) the strength of the owner's mark;
(2) the similarity between the owner's mark and the alleged infringer's mark;
(3) the degree to which the products compete with each other;
(4) the alleged infringer's intent to "pass off" its goods as those of the owner;
(5) incidents of actual confusion; and
(6) the type of product, its costs, and conditions of purchase.
Insty* Bit, Inc., v. Poly-Tech Indus., Inc., 95 F.3d 663, 667 (8th Cir.1996) citing Co-Rect Prods., Inc. v. Marvy! Adver. Photography, Inc., 780 F.2d 1324, 1330 (8th Cir.1985) ("Co-Rect"). The Court must consider each factor in turn; no one factor is controlling. Duluth News-Tribune v. Mesabi Publ'g Co., 84 F.3d 1093, 1096 (8th Cir.1996) ("These factors do not operate in a mathematically precise formula; rather, we use them at the summary judgment stage as a guide to determine whether a reasonable jury could find a likelihood of confusion.") Whether likelihood of confusion exists is ultimately an issue of fact; however, factual disputes regarding a single factor do not preclude a court from entering summary judgment. Duluth News-Tribune v. Mesabi Publ'g Co., 84 F.3d at 1096.
Categorizing DTC's claims as reverse confusion does not change its burden of proof. The test for infringement remains likelihood of confusion. Nevertheless, the Court's analysis of the Co-Rect factors must be modified, as necessary, in a case of reverse confusion. See, e.g., Fisons Horticulture, Inc. v. Vigoro Indus. Inc., 30 F.3d 466, 479-80 (3d Cir.1994) (recognizing modification to the Third Circuit's ten factor test for likelihood of confusion is necessary in a reverse confusion case); Sands, Taylor & Wood Co. v. Quaker Oats Co., 978 F.2d 947, 960-61 (7th Cir.1992) (modifying the analysis of the factors used to determine likelihood of confusion in a reverse confusion case).

(1) the strength of the owner's mark
The Court assesses the strength of the DREAM TEAM mark by its degree of inherent distinctiveness and its distinctiveness in the marketplace. The Court will analyze the strength of the DREAM TEAM mark as it relates to DTC[13] as of the time of defendants' initial alleged infringement. See Fisons Horticulture, Inc. v. Vigoro Indus., *1412 Inc., 30 F.3d at 479 (finding that the mark was strong and in active use when the junior user began using the mark); see also Reverse Confusion: Fundamentals and Limits, 84 Trademark Rep., 23 (liability of a junior user should be judged on the strength of the mark as of the time of the initial alleged infringement and not on the basis of strength resulting from the arguably infringing use). DTC asserts that defendants' initial use of the DREAM TEAM mark began in 1991. Defendants argue that they did not permit licensing of the DREAM TEAM mark until 1993. Based upon the record before it, a reasonable jury could find that defendants were promoting use of the DREAM TEAM mark in connection with the USAB team as early as 1991. Thus, the Court will analyze the strength of the DREAM TEAM mark as of that time.

Inherent Distinctiveness
To determine the inherent distinctiveness of the DREAM TEAM mark, the Court must classify the mark as (1) arbitrary or fanciful, (2) suggestive, (3) descriptive, or (4) generic. Duluth News-Tribune v. Mesabi Publ'g Co., 84 F.3d at 1096. An arbitrary or fanciful mark is the strongest mark and is afforded the highest protection. A generic mark is one used by the general public to identify a category of goods and merits no trademark protection. "Suggestive and descriptive marks fall somewhere in between." Id. A suggestive mark requires some amount of imagination to reach a conclusion regarding the nature of the product. A descriptive mark immediately conveys the nature or function of the product. "[W]hile a descriptive term directly and clearly conveys information about the ingredients, qualities or characteristics of the product or service, the `suggestive' term only indirectly suggests these things." 1 McCarthy on Trademarks § 11:67, pp. 11-109/110.
For the purpose of analyzing defendants' motions for summary judgment, the Court finds that DREAM TEAM is a suggestive mark, inherently distinctive and entitled to protection. It would require some measure of imagination to reach a conclusion that DREAM TEAM refers to sports trading card collages. The mental leap between DREAM TEAM and the attributes of its products, is not, or at least in 1991 was not, instantaneous. Id. In concluding that DREAM TEAM is a suggestive mark, the Court necessarily finds that DREAM TEAM is not a descriptive mark. DREAM TEAM does not describe an intended purpose, function or use of DTC's goods; the size of DTC's goods; the class of users of DTC's goods; a desirable characteristic of DTC's goods; the nature of DTC's goods; or the end effect upon the user of DTC's goods. Id.

Distinctiveness in the Marketplace
In a reverse confusion case, analysis of a mark's distinctiveness in the marketplace its commercial strengthis of considerably less significance than in a forward confusion case.
In forward confusion, the junior user trades on the senior user's good name; it is therefore saved much of the expense of advertising to create market recognition of its mark. In reverse confusion, the junior user is typically a wealthier, more powerful company who can overwhelm the market with advertising. An aggressive junior user may thereby achieve greater commercial strength in a short period of time than the senior user has after years of marketing its product.
Fisons Horticulture, Inc. v. Vigoro Indus., Inc., 30 F.3d at 479. DTC sales from its inception in 1986 through 1995 totalled less than $7 million. DTC spent approximately $2,700 per year on advertising. DTC also promoted its goods and mark through trade shows. To some extent, DTC's products appeared in national mail order catalogs. Affidavit of E. Gaines. Although these facts demonstrate that there was little consumer awareness of DTC's DREAM TEAM mark, the Court will not give considerable weight to the absence of commercial strength. Id.
A reasonable jury could find that the strength and inherent distinctiveness of the DREAM TEAM mark is slightly reduced by the mark's lack of distinctiveness in the marketplace, but that this factor weighs in favor of a finding of likelihood of confusion.

*1413 (2) the similarity between the owner's mark and the alleged infringer's mark
Both DTC and defendants use the identical DREAM TEAM word mark. Use of identical words does not necessarily mean that the two marks are "similar." Duluth News-Tribune v. Mesabi Publ'g Co., 84 F.3d at 1097. "Rather than consider the similarities between the component parts of the marks, we must evaluate the impression that each mark in its entirety is likely to have on a purchaser exercising the attention usually given by purchasers of such products." Id.
Both DTC and NBAP have utilized two different DREAM TEAM logos. See Court's Exhibit 1 attached hereto.[14] The DREAM TEAM words are the prominent feature of each logo. DTC Logo # 1 is green and gold. DTC Logo # 2 is red, white and blue. NBAP Logo # 1 and NBAP Logo # 2 are red, white and blue, however, NBAP permitted licensees to reproduce these logos in black and white. Exhs. l & 2 to Affidavit of S. Rotella, Jr. DTC Logo # 2 incorporates a star. NBAP Logo # 2 incorporates two stars. NBAP Logo # 1 and NBAP Logo # 2 both include a basketball.
The differences in shape and style of these logos, while relevant, do not preclude a finding that the marks are similar. Libman Co. v. Vining Indus. Inc., 69 F.3d 1360, 1362 (7th Cir.1995). The Court is not convinced that a reasonable consumer would distinguish DTC Logo # 2 from NBAP Logo # 1 or NBAP Logo # 2 without a side-by-side comparison. The Court would not reach the same conclusion as to DTC Logo # 1 which adds the words "Collectibles" and "St. Louis." Although defendants state that DTC Logo # 1 is DTC's "primary" logo, Mem. in Supp. (Complaint), p. 27, the record is undeveloped as to what extent DTC utilized each logo. Additionally, defendants initially utilized the DREAM TEAM word mark on television and in press releases.[15] In these instances, defendants' use of DREAM TEAM unaccompanied by any logo is indistinguishable from DTC's DREAM TEAM mark.
Even if a prospective purchaser recognized that DTC's and defendants' logos are distinct, confusion may result if purchasers are likely to assume that the similarities in the designations indicate a connection between the two users. McGregor-Doniger, Inc. v. Drizzle Inc., 599 F.2d 1126, 1134 (1979). The Eighth Circuit has stated, that when evaluating whether marks are similar, the issue "is not whether the public would confuse the marks, but whether the viewer of an [allegedly infringing] mark would be likely to associate the product or service with which it is connected with the source of products or services with which an earlier mark is connected." Mutual of Omaha Ins. Co. v. Novak, 836 F.2d 397, 399 n. 4 (1987) (citation omitted) (emphasis in original)
Defendants assert that their requirement that licensees and sponsors use DREAM TEAM together with the USAB logo decreases any possibility of confusion with DTC's mark. On the contrary, the Court finds that in this reverse confusion context, use of the USAB logo in connection with DREAM TEAM, if relevant at all, may bolster the public's belief that DREAM TEAM is a mark associated with the USAB teams. See Sands, Taylor & Wood Co. v. Quaker Oats Co., 978 F.2d at 960 (in a reverse confusion context, the linking of plaintiff's mark with defendant's brand name is an aggravation, not a justification); see also Americana Trading Inc. v. Russ Berrie & Co., 966 F.2d 1284, 1288 (9th Cir.1992) (prominence of a house mark may serve to create reverse confusion).
A reasonable jury could find that DTC's mark and defendants' marks, all of which include the DREAM TEAM word mark as the prominent feature, are confusingly similar in that ordinary consumers would likely conclude that DTC and defendants share a common source, affiliation, connection or sponsorship. See Fisons Horticulture, Inc. v. Vigoro Indus., Inc., 30 F.3d at 477. A *1414 reasonable jury could find that a viewer of DTC's mark would be likely to associate DTC's products with defendants' use of the DREAM TEAM mark to refer to the USAB teams and that this factor weighs in favor of a finding of likelihood of confusion.

(3) the degree to which the products compete with each other
Defendants assert that the products and services sold by NBAP's licensees and sponsors have no competitive proximity to DTC's trading card collages. Although NBAP's licensees and sponsors have used NBAP's DREAM TEAM logo on a myriad of products and services,[16] defendants argue that "[n]o reasonable person could sensibly conclude that products and services such as these are sufficiently related to DTC's collage products as to create a likelihood of confusion." Mem. in Supp. (Complaint), p. 23.
Although the Court must analyze the degree to which goods compete in evaluating the likelihood of confusion, the significance of this factor may decrease in a case of reverse confusion. See Plus Prods. v. Plus Discount Foods, Inc., 722 F.2d 999, 1004 (2d Cir.1983) (finding reverse confusion and stating that "related but non-competing products can become associated in consumers' minds" ... because ... "the functional differences between the products of the parties is immaterial if confusion as to the source of the goods is evident"); but see Harlem Wizards Entertainment Basketball, Inc., v. NBA Properties, Inc., 952 F.Supp. 1084, 1095 (D.N.J.1997) ("Meaningful differences between the products and services are often cited as a factor tending to negate reverse confusion, even when the products are superficially within the same category.")
The large majority of products upon which defendants' license the DREAM TEAM mark do not compete with DTC's products, nevertheless, a jury could reasonably find that defendants' extensive use of the DREAM TEAM mark on these unrelated products caused consumers to associate DTC's mark with defendants. See, e.g., Mem. in Opp. (Complaint), Exh. 67, Affidavit of Tony Pearson.[17]
DTC also argues that although many of its goods may not directly compete with those goods bearing defendants' DREAM TEAM mark, trademark law prohibits the use of a trademark not only on products that directly compete, but also on products that are considered to be closely related to the senior user's. Sands, Taylor & Wood Co. v. Quaker Oats Co., 978 F.2d at 958. This rule protects the senior user's "ability to enter product markets in which it does not now trade but into which it might reasonably be expected to expand in the future." Id. Several products which contain defendants' DREAM TEAM mark, such as posters and other wall hangings, are related to DTC's collages. Mem. in Opp. (Complaint), p. 40, Exh. 6 and 7. Additionally, it is reasonable to believe that DTC could expand its line of products to include posters and clothing.[18] Nonetheless, DTC's evidence of potential expansion is limited and defendants have presented evidence that DTC lacked and continues to lack the financial ability to expand its product line. Mem. *1415 in Supp. (Complaint), p. 21, n. 15 (describing DTC's financial condition from 1991 to the present). A reasonable jury could find that DTC's arguments of expansion are speculative.
A reasonable jury could find that the slight extent to which DTC's products compete with those products bearing defendants' DREAM TEAM mark weighs against a finding of likelihood of confusion. Nonetheless, a reasonable jury could find that defendants' use of the DREAM TEAM mark, even on products unrelated to plaintiff's products, contributed to consumers associating DTC's DREAM TEAM mark with defendants. In a reverse confusion case, this fact increases the likelihood of confusion.

(4) the alleged infringer's intent to "pass off" its goods as those of the owner
By definition, in a reverse confusion case, "the junior user does not seek to trade on the good will and name of the senior user; instead he overwhelms it." Fisons Horticulture, Inc. v. Vigoro Indus., Inc., 30 F.3d at 480. Consequently, in this reverse confusion case the Court will apply a modified "relevant intent" inquiry. In Fisons Horticulture, Inc. v. Vigoro Indus., Inc., the court found that the intent inquiry should focus on whether defendants: (1) conducted an adequate name search for other companies marketing similar goods under the mark in question; (2) followed through with their investigation when they found there were such companies; (3) considered the likelihood of confusion with other companies' marks and products; (4) attempted to contact companies using a similar mark, such as plaintiff; and (5) were careless in their evaluation of the likelihood of confusion. But see also Sands, Taylor & Wood Co. v. Quaker Oats Co., 978 F.2d at 960 (finding that the "intent" element is essentially irrelevant in a reverse confusion case because "[i]n a reverse confusion case ... the defendant by definition is not palming off or otherwise attempting to create confusion as to the source of his product") (emphasis in original).
The Court finds that defendants purposely utilized the DREAM TEAM mark in connection with the USAB teams with knowledge that DTC had prior rights in the mark on sports related goodscollages of sports trading cards. Although defendants' awareness of DTC's use and pending registration for the DREAM TEAM mark does not necessarily create an inference of bad faith, defendants have presented no evidence that they considered the potential that consumers would be confused by their use of DREAM TEAM in connection with the 1992 USAB Olympic team or that they considered the impact this confusion would have on DTC. To the extent that this factor is relevant, a reasonable jury could find that it weighs in favor of a finding of a likelihood of confusion.

(5) the incidents of actual confusion
Although isolated instances of actual confusion do not preclude entry of summary judgment in favor of defendants, DTC need not show actual confusion to establish likelihood of confusion. SquirtCo v. Seven-Up Co., 628 F.2d 1086, 1091 (8th Cir.1980). To establish actual confusion in a reverse confusion case, the Second Circuit has held that the only relevant confusion is a belief by the senior user's purchasers or prospective purchasers that the senior user's product was produced by or affiliated with the junior user. Lang v. Retirement Living Pub. Co., Inc., 949 F.2d 576, 583 (2d Cir.1991). The relevant confusion to be avoided is that which affects purchasing decisions, not confusion generally. Id. at 582-83; see also W.W.W. Pharmaceutical Co., Inc. v. Gillette Co., 984 F.2d 567, 574 (2d Cir.1993).
Other courts have not taken such a limited view of what constitutes evidence of actual confusion. Many courts have found that customer inquiries to the senior user as to whether it was affiliated or connected with the junior user, although perhaps insufficient to prove actual confusion standing alone, are relevant, admissible and should be viewed in conjunction with other evidence of actual confusion. See Country Floors, Inc. v. Gepner and Ford, 930 F.2d 1056, 1064 (3d Cir.1991) (evidence of actual confusion, consisting in part of inquiries about a connection between *1416 the two stores, precluded summary judgment); Coach House Restaurant Inc. v. Coach and Six Restaurants, Inc., 934 F.2d 1551, 1562 (11th Cir.1991) (the Trademark Trial and Appeal Board incorrectly disregarded evidence of actual confusion consisting of inquiries as to the affiliation between the two restaurants); see generally 3 McCarthy on Trademarks § 23:16, pp. 23-38, 39 ("The better view would seem to be that while enquiry evidence is admissible and relevant, standing alone with no other evidence it is insufficient proof of actual confusion.")
Plaintiff's purported evidence of actual confusion consists of the following: testimony from Joe McMyler, a buyer from J.C. Penney, Mem. in Opp. (Complaint), Exh. 70; affidavits from Edward Lekson, Warren Weitzman and Tony Pearson, Mem. in Opp. (Complaint), Exh. 67; and survey results from Dr. Lakshamn Krishnamurthi, Mem. in Opp. (Complaint), Exh. 65.
First, the testimony from Joe McMyler is evidence of actual confusion. McMyler found DTC's use of DREAM TEAM confusing to him as a buyer for J.C. Penney and he felt that it would be confusing to J.C. Penney customers. Depo. of J. McMyler, pp. 34-35. For example, McMyler expressed confusion as to why the DREAM TEAM mark appeared on DTC collages of Roberto Clemente, a baseball player, and Jason Kidd, a professional basketball player who was not a member of any USAB team.
Next, Edward Lekson, an employee of a dealer in official licensed sportswear and memorabilia, inquired at a DTC booth about the connection between DTC and NBAP. Lekson stated that if he had not taken the time to inquire, he would have been hesitant "to do business" with DTC. Affidavit of E. Lekson. Warren Weitzman, president of a company which sells sports plaques, components, photos, and displays, inquired at a DTC booth about the relationship between DTC and defendants. Weitzman was interested in becoming a DTC customer (for resale purposes) and was surprised to learn that DTC, although unrelated to defendants, could use the DREAM TEAM mark. Affidavit of W. Weitzman. Although reasonable minds could differ as to whether the confusion experienced by Lekson and Weitzman directly related to a purchasing decision, this evidence, along with the testimony of Tony Pearson,[19] constitutes inquiry evidence which the Court will view in conjunction with DTC's evidence of actual confusion.
Finally, plaintiff relies upon the survey results of Dr. Lakshamn Krishnamurthi. Dr. Krishnamurthi concluded, in part, that the public associates the DREAM TEAM mark with defendants and believes that "anyone wishing to use the DREAM TEAM mark must get permission to do so." Mem. in Opp. (Complaint), p. 33, Exh. 65. Krishnamurthi's survey results are not highly probative on the issue of actual confusion because they fail to analyze how the purported confusion affects the purchasing and/or selling of any of the goods in question.[20]W.W.W. Pharmaceutical Co., Inc. v. Gillette Co., 984 F.2d at 574. Nonetheless, the Court finds that the portion of the survey which demonstrates a prevalence of the belief that anyone wishing to use the DREAM TEAM mark must obtain defendants' permission to do so constitutes nominal additional evidence of actual confusion. See Anheuser-Busch v. Balducci Publications, 28 F.3d 769, 775 (8th Cir.1994) ("The survey evidence, whether considered as direct or indirect evidence of actual confusion, tilts the analysis in favor of [plaintiff] ... because [o]ver half of those surveyed thought [defendant] needed [plaintiff's] approval to publish the ad.") A reasonable jury could find sufficient evidence of actual confusion to support a finding of a likelihood of confusion.

(6) the type of product, its costs, and conditions of purchase
An analysis of this factor requires the Court to focus on the degree of care reasonably expected of potential customers. Anheuser-Busch, Inc. v. Balducci Publications, *1417 28 F.3d at 774. DTC's collages retail (unframed) at prices in excess of $30.00. Although a customer's degree of care does not depend solely upon price, a purchaser of a low cost item ordinarily exercises minimal care in selecting the item. Nike, Inc. v. Just Did It Enter., 6 F.3d 1225, 1230 (7th Cir. 1993). The Court finds that individual purchasers of a DTC collage are likely to exercise a relatively high degree of care. Additionally, DTC customers who purchase the collages for resale are likely to be specialized and exercise an even higher degree of care in their purchasing decisions.
The Court has located no authority which thoroughly analyzes application of this factor in a reverse confusion context; however, DTC and defendants agree that likelihood of confusion decreases as the degree of care exercised by a purchaser increases. Mem. in Opp. (Complaint), p. 42; Mem. in Supp. (Complaint), pp. 35-36. Based upon its own analysis, the Court finds that the degree of care exercised by consumers of DTC's products, although relatively high, may weigh in favor of a finding of a likelihood of confusion in this reverse confusion context.
A purchaser of a relatively expensive item, who is taking great care in his or her selection, would arguably be more concerned about whether the product is legitimate or an imitation. Ultimately, the purchaser who takes more care may choose not to purchase the product based upon his or her concern that it is the product of an unauthorized infringer, whereas it is likely of little concern to the purchaser of an inexpensive product whether or not the product is that of an unauthorized infringer. The Court's analysis is consistent with prior Eighth Circuit law wherein the Court has found that a high degree of care does not necessarily reduce likelihood of confusion. See Mutual of Omaha Ins. Co. v. Novak, 836 F.2d at 401 n. 7 ("this factor is intended to discern `whether the degree of care exercised by the purchaser can eliminate the likelihood of confusion [that] would otherwise exist.'") (citation omitted); but see Fisons Horticulture, Inc. v. Vigoro Inds. Inc., 30 F.3d at 476 n. 12 (applying the standard forward confusion analysis of "degree of care" in a reverse confusion case).
Although this factor would weigh in favor of defendants in a forward confusion case, the Court finds that the degree of care exercised by potential DTC consumers may increase the likelihood of confusion in this reverse confusion context. Based upon the Court's analysis, a reasonable jury could find that this factor weighs in favor of a finding of a likelihood of confusion.[21]
Based upon its evaluation of each of the six factors, the Court concludes that DTC has created genuine issues of fact such that a reasonable jury could find a likelihood of confusion. Likelihood of confusion is an issue of fact. Because DTC's claims have withstood the challenge of defendants' motions for summary judgment, the jury becomes the finder of fact and the Court's balancing of the factors herein is not binding upon it.

iii. Whether DTC's own unclean hands bar its claims
Defendants argue that DTC's unclean hands should bar it from proceeding on its second amended complaint. Defendants' allegations of unclean hands are essentially two-fold. First, defendants allege that DTC's photocopying and use of the "counterfeit" photocopies of licensed trading cards in its collages constitute unclean hands. In addition, defendants allege that DTC's incorporation of licensed trading cards into its collages without permission or a disclaimer of affiliation constitutes unclean hands. For reasons the Court will discuss, see pp. 39-45, defendants' second allegation of DTC's unclean hands is based upon an erroneous interpretation of the law of repackaging. The Court finds that DTC's lack of a disclaimer of affiliation on its collages is insufficient as a matter of law to constitute unclean hands, thus the Court's analysis will proceed only as to defendants' first allegation.
*1418 No rigid formula exists for the Court to apply the doctrine of unclean hands. It requires the free and just exercise of discretion. Johnson v. Yellow Cab Co., 321 U.S. 383, 387, 64 S.Ct. 622, 624, 88 L.Ed. 814 (1944); K-Mart Corp. v. Oriental Plaza, Inc., 875 F.2d 907, 912 (1st Cir.1989) (a court has wide discretion in deciding whether to impose the severe sanction of barring a party's claims based upon its own unclean hands). Moreover, a party's unclean hands do not always form a complete bar to relief but instead may limit the scope of relief. 4 McCarthy on Trademarks § 31:51, p. 31-85.
Defendants' first allegation of DTC's unclean hands finds some factual support in the record. DTC made color photocopies of sports trading cards and utilized at least some of the photocopies in its collages. The packaging of the collages concealed the fact that one or more of the depicted trading cards were not actually trading cards, but color photocopies. Purchasers of the collages often believed they were purchasing the actual trading cards. Affidavit of R. Fishman.
Nevertheless, the extent of DTC's photocopying is in dispute. DTC characterizes the photocopying as minimal, isolated and accidental, comprising less than one percent of all DTC sales. Defendants characterize the photocopying as pervasive, extensive and continuous, comprising eleven to thirteen percent of all DTC sales. The nature of DTC's photocopying is also in dispute.[22] Defendants have not established that DTC's photocopying amounted to illegal counterfeiting. Moreover, only some of the trading cards which were copied bore copyright notices. Many of the color photocopies which DTC made were never sold or put into collages.
In analyzing defendants' allegation that DTC's "counterfeiting" constitutes unclean hands and thus, should bar DTC's claims, the Court must also consider defendants' conduct. "[A]lleged unclean hands cannot be considered in a vacuum, apart from the nature of [the] conduct which gave rise to the litigation." 4 McCarthy on Trademarks § 31:51, p. 31-86 citing Republic Molding Corp. v. B.W. Photo Utilities, 319 F.2d 347, 349 (9th Cir.1963) ("the court should not automatically condone the defendant's infractions because the plaintiff is also blameworthy, thereby leaving two wrongs unremedied and increasing the injury to the public.... The relative extent of each party's wrong upon the other and upon the public should be taken into account and an equitable balance struck.") As demonstrated by the above analysis of defendants' motion for summary judgment as to DTC's second amended complaint, the Court finds that a reasonable jury could find that defendants' conduct created a likelihood of confusion.
The application of the unclean hands doctrine raises primarily questions of fact. Dollar Systems v. Avcar Leasing Systems, 890 F.2d 165, 172 (9th Cir.1989). Genuine issues of fact exist as to the nature of and extent of DTC's photocopying of trading cards, thus, the Court cannot conclude that DTC's alleged unclean hands, when compared with the wrongs alleged against defendants, rise to a level necessary to bar its claims. DTC's unclean hands, if proven, may be relevant to the scope of relief to which DTC is entitled. 4 McCarthy on Trademarks § 31:53, p. 31-89 ("[U]nclean hands usually means that the plaintiff's fault, like the defendant's, is relevant only to the scope of relief.")
For all of the foregoing reasons, the Court will deny defendants' motions for summary judgment as to DTC's second amended complaint.

E. Counterclaimants' Motion for Summary Judgment as to Counter-claims I, II, VI, and VII
DTC has sold collages which contain basketball trading cards, and in some instances, photographs of NBA players. Often, the name of a particular NBA team *1419 appears in the center of the collage, surrounded by trading cards of players from that particular NBA team. The trading cards themselves, which are incorporated into the collage, contain the trademark of the particular NBA team (or NBAP) and depict an NBA player in his team uniform. See Court's Exhibit 2. DTC's collages do not contain a disclaimer or other explanatory label that the collages are not a licensed product of the NBA, NBAP, USAB or the NBA teams, or that DTC is not affiliated with the NBA, NBAP, USAB or NBA teams. Counterclaimants argue that DTC's failure to include the above-referenced disclaimer or explanatory label constitutes, as a matter of law, a violation of counterclaimants' rights under the Lanham Act (Counterclaims I and II) and common law (Counterclaims VI and VII). Counterclaimants state that "[i]t is well-established that a party seeking to repackage a trademarked good to make it part of a new productas DTC did by putting NBA trading cards into its collage products must include on the product an explanatory label ..." Mem. in Supp. (Counterclaims), p. 7 (emphasis added).
The Court's analysis of counterclaimants' motion begins with the principle that trademark law does not reach the sale of genuine goods bearing a true mark even though the sale is not authorized by the mark owner.
Since 1924, courts have recognized a basic limitation on the right of a trademark owner under the Lanham Act to control the distribution of its own products. Beginning with Prestonettes Inc. v. Coty, 264 U.S. 359, 44 S.Ct. 350, 68 L.Ed. 731 ... (1924), courts have consistently held that, with certain well-defined exceptions, the right of a producer to control distribution of its trademarked product does not extend beyond the first sale of the product. Resale by the first purchaser of the original article under the producer's trademark is neither trademark infringement nor unfair competition.
Sebastian Intern. v. Longs Drug Stores, 53 F.3d 1073, 1074 (9th Cir.1995). This trademark principle is the "first sale" rule. Thus, someone who sells trademarked good without change is not liable for trademark infringement.
A premise of counterclaimants' argument is that DTC did not sell the trademarked cards "without change" but "repackaged" the trading cards, thus making the "first sale" rule inapplicable. The Court finds that DTC has repackaged the trading cards and the first sale rule is inapplicable. See Allison v. Vintage Sports Plaques, No. 95-P-1555-S, 1996 WL 679426, at *4 (N.D.Ala. July 29, 1996) ("This is more appropriately classified as a case of an entrepreneur repackaging or displaying the trading cards in a more attractive way to consumers.")
The sole basis for counterclaimants' motion for summary judgment as to the counterclaims in question is their legal argument that a disclaimer or explanatory label is required when trademarked goods are repackaged. To support this contention, counterclaimants rely upon Prestonettes, Inc. v. Coty, 264 U.S. 359, 44 S.Ct. 350, 68 L.Ed. 731 (1924) ("Coty"), "the landmark case on trademark use in repacking and rebottling goods." McCarthy on Trademarks § 25:35, p. 25-53. In Coty, the defendant purchased genuine Coty toilet powder from plaintiff, subjected the powder to pressure, added a binder and sold the new compound in a metal compact case under the Coty trademark. Coty complained that the defendant had no legal right to use its registered trademark. Id. at 366. The Supreme Court affirmed the trial court's decision which allowed the defendant to sell the toilet powder but ordered the defendant to put labels on the goods which clarified that the items were made by Coty and were independently rebottled by Prestonettes. Id. at 367. In affirming the trial court, the Supreme Court upheld the right of a third-party to use the trademark of a product's manufacturer in connection with the repackaging and resale of such product, provided that use of the trademark does not create confusion as to the source of the repackaged goods. The Eighth Circuit has relied upon Prestonettes v. Coty to support the basic proposition that trademark law is designed to prevent sellers from confusing or deceiving the consuming public about the origin or make of a product and, therefore, *1420 generally does not reach the sale of genuine goods bearing a true mark. See, e.g., Henry v. Chloride, 809 F.2d 1334, 1349 (8th Cir. 1987).
Coty and its progeny do not support counterclaimants' contention that a repackager of trademarked goods has an absolute obligation to include a disclaimer or an explanatory label on its product. To support their argument, counterclaimants rely upon the following sentence from Professor McCarthy:
Under the authority of the Coty case, the courts have required a repacker and rebottler to use a label closely following the label approved in the COTY case.
McCarthy on Trademarks § 25:35, p. 25-55 (footnote omitted). Out of context, this sentence may appear to support counterclaimants' argument that a repackager of trademarked goods "must include an explanatory label on the product." Counterclaimants' Reply Mem. in Supp. (Counterclaims), p. 2. Nonetheless, the Court has carefully analyzed the cases which Professor McCarthy relies upon for this statement (those cases cited in the omitted footnote) and each of the cases counterclaimants rely upon. None stands for the proposition that a repackager of trademarked goods has an absolute obligation to include a disclaimer or an explanatory label on its product. Moreover, none stands for the proposition that likelihood of confusion is assumed in a repackaging case. To prevail on a claim of federal or common law trademark infringement or unfair competition, a party must demonstrate likelihood of confusion. 3 McCarthy on Trademarks § 23.1, p. 23-6; SquirtCo v. Seven-Up Co., 628 F.2d at 1091. "Even repackaging of goods is not trademark infringement if it does not deceive the public or damage the mark owner's goodwill." Polymer Tech. v. Mimran, 975 F.2d 58, 61-62 (2d Cir.1992). This is because the test for trademark infringement is the likelihood that the public will be confused about the source of the product, "which confusion ordinarily does not exist when a genuine article bearing a true mark is sold." NEC Electronics v. CAL Circuit Abco, 810 F.2d 1506, 1509 (9th Cir. 1987). Absent any analysis of a likelihood of confusion by counterclaimants, the Court readily concludes that a reasonable jury could find that DTC's "repackaging" of the trading cards, even without a disclaimer or explanatory label, is not likely to cause confusion.[23]
To the extent that counterclaimants' focus on DTC's use of an NBA team name in the center of a collage, see Court's Exhibit 2, rather than the use of the trading cards themselves, counter-claimants are also not entitled to summary judgment.[24] In many cases, a trademark may be lawfully used simply to describe something, rather than identify its source because in some instances it is virtually impossible to refer to a particular product without using its mark. See, e.g., New Kids on the Block v. New America Pub., Inc., 971 F.2d 302, 306 (9th Cir.1992) ("[O]ne might refer to `the two-time world champions' or `the professional basketball team from Chicago,' but it's far simpler (and more likely to be understood) to refer to the Chicago Bulls.") Again, absent any analysis *1421 of a likelihood of confusion by counterclaimants, the Court readily concludes that a reasonable jury could find that DTC's use of an NBA team name on a collage is not likely to cause confusion, but is simply a way to identify a particular NBA team.
Finally, DTC argues that to the extent any such obligation exists, counterclaimants have waived their right to require an explanatory label. Counterclaimants base this argument upon two statements from Terese Cohen, NBAP's trademark counsel. Mem. in Opp. (Counterclaims), p. 5., Exh. 56. First, on April 20, 1993, in a letter describing a draft settlement agreement, Cohen stated that while "[NBAP do]es not object to your client's product which incorporates our licensed trading cards, we do object to their additional use of our marks as the central prominent focal point of each piece." This letter was apparently written in the context of settlements negotiations and its admissibility is the subject of a pending motion in limine. See Fed.R.Evid. 408. Next, DTC relies upon a July 2, 1991 handwritten note from Cohen which states "His resellingnot problem." Mem. in Opp. (Counterclaims), pp. 5-6, Exh. 54. A dispute of fact exists as to whether this notation reflects settlement discussions. Counterclaimants' Mem. in Supp. (Counterclaims), p. 6; Depo. of Cohen, 102-103; DTC's Sur. Mem. in Opp. (Counterclaims), p. 1. Because the admissibility of the documents which purportedly constitute a waiver is in question, and because the Court will deny the motion for summary judgment on grounds separate from DTC's waiver argument, the Court will not analyze DTC's waiver argument any further at this time.
For all of the foregoing reasons, the Court will deny counterclaimants' motion for summary judgment as to Counterclaims I, II, VI and VII.

F. DTC and counterclaimants' cross-motions for summary judgment as to Counterclaim X
Counterclaimants allege that for the past five years DTC has been making color photocopies of sports trading cards bearing registered trademarks and/or copyrights and has been selling these photocopies as part of collages that bear the DREAM TEAM mark, all without the consent or authorization of the owner of the trademarks and/or copyrights. Counterclaimants allege that DTC's photocopying and use of the photocopies in its collages constitutes "counter-feiting" which requires cancellation of the DREAM TEAM mark. Counterclaimants' Reply Mem. in Supp. (Counterclaims), p. 10.
Although a petition to the PTO is the primary means of securing cancellation of a mark, this Court has concurrent jurisdiction to order cancellation. Lanham Act § 37, 15 U.S.C. § 1119; Ditri v. Coldwell Banker Residential Affiliates, Inc., 954 F.2d 869, 873 (3d Cir.1992). This Court is, however, bound by the grounds for cancellation set forth in § 14 of the Lanham Act. 4 McCarthy on Trademarks § 30:112, pp. 30-185/186. To be entitled to cancellation, counterclaimants must prove that they have standing to petition to cancel in that they are likely to be damaged by the registration and "that there are valid grounds why the registration should not continue to be registered." Id. at § 20:41, p. 20-77. Counterclaimants' arguments are essentially that the Court should cancel DTC's DREAM TEAM registration based upon activities that counterclaimants believe constitute copyright infringement, unfair competition and false advertising.
Allegations that the registered mark has been misused as an instrument of patent infringement, unfair competition, false advertising, or antitrust violation, are not regarded as sufficient grounds to cancel.
3 McCarthy on Trademarks § 20:54, p. 20-95 (footnote and citations omitted). Counterclaimants' allegationsthat in addition to lawful use DTC made "material" unlawful use of the DREAM TEAM markconstitute insufficient grounds to cancel DTC's registration. Counterclaimants have cited no authority to support their proposition that cancellation of a mark is warranted when a party demonstrates some unlawful use of a mark by its owner who, for the most part, is using the mark lawfully. The cases counterclaimants rely upon are inapposite.
The Court will deny counterclaimants' motion for summary judgment as to Counterclaim *1422 X of counterclaimants' third amended counterclaims and grant DTC's motion for summary judgment as to this counterclaim.
Accordingly,
IT IS HEREBY ORDERED that the motion for summary judgment of defendant NBA Properties, Inc. as to plaintiff's second amended complaint [Doc. # 156] is denied.
IT IS FURTHER ORDERED that the motion for summary judgment of defendant USA Basketball, Inc. as to plaintiff's second amended complaint [Doc. # 160] is denied.
IT IS FURTHER ORDERED that the request of plaintiff Dream Team Collectibles, Inc. for the Court to strike the affirmative defense of unclean hands from the amended answer of NBA Properties, Inc. and the answer of USA Basketball, Inc. is denied.
IT IS FURTHER ORDERED that the motion of counterclaim plaintiffs NBA Properties, Inc. and the NBA teams for summary judgment as to Counterclaims I, II, VI, VII and X [Doc. # 157] is denied.
IT IS FURTHER ORDERED that motion by counterclaim-defendant Dream Team Collectibles, Inc. for summary judgment as to Counterclaim X [Doc. # 161] is granted.

*1423 
NOTES
[1] NBAP is the licensing arm of the National Basketball Association ("NBA").
[2] USAB is a nonprofit corporation whose mandate is to select, sponsor and support men's and women's basketball teams for international competition, including the Olympic Games ("Olympics")
[3] The other counterclaim plaintiffs ("NBA teams") are as follows: Atlanta Hawks, Ltd. d/b/a the Atlanta Hawks, Celtics Limited Partnership d/b/a the Boston Celtics, Charlotte Hornets NBA Limited Partnership d/b/a the Charlotte Hornets, Chicago Professional Sports Limited Partnership d/b/a the Chicago Bulls, Gund Business Enterprises, Inc. d/b/a the Cleveland Cavaliers, Dallas Basketball Limited d/b/a the Dallas Mavericks, The Denver Nuggets Limited Partnership d/b/a the Denver Nuggets, Detroit Pistons Basketball Company d/b/a the Detroit Pistons, CC Partners d/b/a the Golden State Warriors, Rocket Ball, Ltd. d/b/a the Houston Rockets, Pacers Basketball Corporation d/b/a the Indiana Pacers, The Los Angeles Lakers, Inc. d/b/a the Los Angeles Lakers, The Miami Heat Limited Partnership d/b/a the Miami Heat, Milwaukee Bucks, Inc. d/b/a the Milwaukee Bucks, Minnesota Timberwolves Basketball Limited Partnership d/b/a the Minnesota Timberwolves, Meadowlands Basketball Associates d/b/a the New Jersey Nets, Orlando Magic Ltd. d/b/a the Orlando Magic, The Philadelphia 76ers Basketball Club, Inc. d/b/a the Philadelphia 76ers, Trail Blazers Inc. d/b/a the Portland Trail Blazers, Sacramento Kings Limited Partnership, L.P. d/b/a the Sacramento Kings, San Antonio Spurs, Ltd. d/b/a the San Antonio Spurs, Seattle SuperSonics, Inc. d/b/a the Seattle SuperSonics and Capital Bullets Basketball Club, Inc. d/b/a the Washington Bullets.
[4] On March 25, 1997, counterclaimants dismissed counterclaims VIII and IX.
[5] The Court will use the parenthetical "(Complaint)" to refer to pleadings related to defendants' motions for summary judgment as to DTC's second amended complaint. The Court will use the parenthetical "(Counterclaims)" to refer to pleadings related to counterclaimants' motion for summary judgment as to Counterclaims I, II, VI, VII and X and DTC's motion for summary judgment as to Counterclaim X.
[6] Defendants learned of DTC's photocopying during the course of this litigation. Between January 30, 1996 and April 3, 1996, attorneys for NBAP purchased fourteen trading card collages made with color photocopies of football and baseball trading cards. Counterclaimants' Mem. in Supp. (Counterclaims), p. 4; Affidavit of B. Beatty. Subsequently, DTC made available for inspection 91 DTC collages which contained color photocopies of the front sides of trading cards and approximately 5,200 color photocopies of the front sides of trading cards which were not incorporated into collages. Counterclaimants' Mem. in Supp. (Counterclaims), p. 5; Affidavit of M. Kahn. None of the photocopies were of basketball trading cards.
[7] Counterclaimants argue that based upon the Kwik Kopy records, DTC made over 30,000 color photocopies of sports trading cards. Counterclaimants' Mem. in Opp. (Counterclaims), p. 10 n. 5, Affidavit of K. Sullivan. Counterclaimants originally estimated the number at 70,000. Counterclaimants' Mem. in Supp. (Counterclaims), p. 5. DTC has demonstrated the inaccuracy of even the lower estimate. Moreover, Gaines estimates that not more than one percent of DTC's sales were of collages containing photocopied trading cards.
[8] See Minnesota Pet Breeders, Inc. v. Schell Kampeter, Inc., 41 F.3d 1242, 1246 (8th Cir.1994) (referring to a theory of reverse confusion in dicta).
[9] USAB has adopted and incorporated by reference NBAP's motion for summary judgment, memorandum in support and reply memorandum.
[10] Defendants assert that their arguments apply to all of DTC's claims because the same legal principles govern claims of trademark infringement and unfair competition under Missouri statutory and common law and the Lanham Act. Mem. in Supp. (Complaint), p. 12 n. 9. For the purpose of defendants' motions for summary judgment, the Court will proceed on the assumption that the same legal principles govern all of the DTC's claims. Nonetheless, differences in DTC's claims under the Lanham Act (Counts I, II, VI and VII), Missouri statutes (Counts III and VIII) and common law (Counts IV, V, IX and X) may be relevant at trial. The parties should consider the potential impact of these differences on elements of claims, requirements for proof, and potential relief.
[11] Defendants argue that popularization of the DREAM TEAM term by the media, "even if fostered by defendants," conferred on defendants the right to license the term in connection with goods and services sold in association with the USAB teams because NBAP's conduct was not "unlawful." Reply. Mem. (Complaint), pp. 3, 10 (emphasis added). The holding of IHSA v. GTE does not support defendants' argument. Although the Court in IHSA v. GTE refers to "culpable conduct of the defendant", "culpable" is not the equivalent of "unlawful."
[12] Defendants cite fifteen articles which mention DREAM TEAM from February and March of 1991. Most of these articles refer directly to the February 18, 1991 Sports Illustrated cover. See, e.g., Mike Conklin, "Odds & Ins," Chi. Trib., Mar. 13, 1991, at 7 ("The Sports Illustrated cover that had a U.S. Olympic dream team of Michael Jordan, Magic Johnson, Patrick Ewing, Karl Malone and Charles Barkley never will happen ... "); Mark Heisler, "Big Ben Has to be More Popular in Seattle," L.A. Times, Feb. 24, 1991, at 4 ("Despite posing with Johnson, Barkley, Patrick Ewing and Karl Malone for Sports Illustrated's dream team, Michael said ..."). Defendants cite five articles which mention DREAM TEAM from April of 1991. None refer to the 1992 USAB Olympic team. See, e.g., Virginia Mann, "It's Barney Miller with White Coats," The Record, Apr. 16, 1991, at B08 (mentioning the film "The Dream Team" starring Michael Keaton); Pearl Stewart, "King's X Bar Being Sold Trivia May Stop," San Francisco Chron., Apr. 19, 1991, at A25 ("Fantasy football turns football fans into National Football League general managers who draft dream teams, make trades ..."). Defendants cite ten articles which mention DREAM TEAM from May 1, 1991 through July 14, 1991. Many of these articles are irrelevant and several relate to the use of the term DREAM TEAM by Pinnacle Brands, Inc. (previously known as Score) in connection with non-basketball sports trading cards. DTC is currently in litigation with Pinnacle over Pinnacle's use of the DREAM TEAM mark. That litigation is pending in this district, Cause No. 4:95CV2407-DDN. Mem. in Opp. (Complaint), p. 8.
[13] DTC and defendants have analyzed the strength of the DREAM TEAM mark as it relates to DTC, yet both have mentioned a possibility of analyzing the mark as it relates to defendants. Mem. in Supp. (Complaint), pp. 24-27; Mem. in Opp. (Complaint), pp. 34-37. At least one court has held that the relevant mark to examine in a reverse confusion case is that of the junior user. Sands, Taylor & Wood Co. v. Quaker Oats Co., 978 F.2d 947, 959 (7th Cir.1992). The Court is persuaded that the parties have provided the proper analysis which is to examine the strength of the senior user's mark. See Thad G. Long & Alfred M. Marks, Reverse Confusion: Fundamentals and Limits, 84 Trademark Rep., 1, 23 (1994).
[14] The Court has designated the logos as DTC Logo # 1, DTC Logo # 2, NBAP Logo # 1 and NBAP Logo # 2.
[15] NBAP did not create its first DREAM TEAM logo until October of 1993. Mem. in Supp. (Complaint), p. 10.
[16] These products and services include snack foods, gasoline and motor oil, credit card services, processed foods, watches, telecommunications services, soft drinks, fast food restaurant services, towels, express delivery services, pins, puzzles, backboards, video games and basketballs. Mem. in Supp. (Complaint), p. 23.
[17] Pearson purchased a bottle of Sprite with a DREAM TEAM bottle cap. The inside of the bottle cap indicated that he had won an NBA jersey. Pearson took the winning bottle cap to DTC's retail store located in Union Station in St. Louis, Missouri (Dream Team Collectibles) to receive his NBA jersey. Pearson knew that the DTC store has some items of apparel. The manager at the DTC store informed Pearson that DTC was not affiliated with the NBA and that Pearson could not redeem his winning bottle cap at the store. Pearson then went to the local Coca-Cola distributor to find out where he could redeem his winning bottle cap. A Coca-Cola representative told Pearson to return to the DTC store because all of the DREAM TEAM stores were supposed to redeem the winning bottle caps as part of the Sprite promotion. Pearson returned to the DTC store and was again informed, this time by the manager, that DTC was not affiliated with NBA or the Sprite DREAM TEAM promotion.
[18] To a limited extent, DTC has used its DREAM TEAM mark on other sports-related merchandise, including apparel.
[19] See discussion at footnote 17.
[20] The Court makes no determination whether the survey evidence is relevant to other issues in this case. See generally 4 McCarthy on Trademarks § 32:158, pp. 32-190/192 (survey evidence may be introduced for a variety of purposes).
[21] Applying the standard forward confusion analysis and weighing this factor against a finding of likelihood of confusion would not change the Court's ultimate conclusion that genuine issues of fact exist such that a jury could find a likelihood of confusion.
[22] DTC copied only baseball and football trading cards except for one instance where DTC copied a Magic Johnson basketball trading card, not for use in a collage, but to "show reps and customers what it looked like." DTC's Reply Mem. in Supp. (Counterclaims), p. 8; Depo. of E. Gaines, pp. 685-87.
[23] Although reaching the conclusion that DTC has "repackaged" the trading cards by utilizing them in its collages, the Court finds that this case is factually distinct from Coty and the standard "repackaging" case. NBAP, as the exclusive licensee of the marks and designs of the NBA and the NBA teams, allowed certain card manufacturers (such as Fleer or Topps) to use those marks and designs. Presumably, as a result of those arrangements, NBAP received compensation. In a straight-forward repackaging case, the complaining party is the owner of the goods. In this case, however, the complaining party is not the owner of the repackaged goods, e.g., Fleer or Topps, but the owner of the mark which is embodied on those goods. Neither party has argued that this factual distinction should affect the Court's analysis of NBAP's motion for summary judgment as to Counterclaims I, II, VI and VII. The Court notes, however, that the presence of a manufacturer's logo on the trading cards, e.g, Topps or Fleer, may be an indication of an intermediary's presumably lawful use of the counterclaimants' marks. The presence of a such a logo may tend to lessen the likelihood of confusion a consumer may experience as to whether the collage itself was affiliated with or sponsored by counterclaimants.
[24] Counterclaimants appear to concede that they are not seeking summary judgment on this point. Counterclaimants' Reply Mem. in Supp. (Counterclaims), p. 5, n. 3.